IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Otar Dularidze and Alona Lensky<br><br><br>PLAINTIFFS<br><br>VS.<br><br>Turkish Airlines Inc. (also known in Turkish as Turk Hava Yollari),<br><br><br>DEFENDANT. | Civil Action No.:<br><br>COMPLAINT FOR NEGLIGENCE, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, ASSAULT, FALSE IMPRISONMENT AND IN THE ALTERNATIVE FOR AN ACCIDENT UNDER THE MONTREAL CONVENTION. |

INTRODUCTION

This is an action against  Turkish Airlines Inc. (hereinafter "TA") for negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, assault, false imprisonment, or, alternately, for an accident under the Montreal Convention resulting from an incident that occurred on July 1, 2019 at the Istanbul Airport where airline employees summoned airport police for the purpose of intimidating the traveling American family to force them to delete a video of employees wrongfully denying them boarding, resulting in the family being terrorized by such actions including Mr. Dularidze being pistol whipped and otherwise beaten in a private bathroom and having his life threatened after airline employees opened the locked bathroom door to give police officers access and then waited, watching and listening from the outside, while the beating was administered.  Plaintiffs suffered damages including physical and emotional injuries and additionally seek punitive damages.

JURISDICTION & VENUE

1.      This Court has jurisdiction over the subject matter of the first five causes of action set

        forth herein pursuant to 28 U.S.C.A. 1332 (a) (2) as to all causes of action herein.

2.      This Court has jurisdiction over the sixth cause of action set forth herein pursuant to 28

        U.S.C. Sec. 1331, insofar as a federal question is presented pursuant to the Convention

        for the Unification of Certain Rules for International Carriage by Air done at Montreal on

        May 28, 1999 (the "Montreal Convention"), a treaty of the United States.

3.      Venue in this district has been selected by Plaintiffs pursuant to 28 U.S.C. § 1391 (b) (1)

        because it is a District in the United States where Defendants conduct business, or

        alternatively 28 U.S.C. 1391 (b) (3) because the Defendant is subject to the personal

        jurisdiction of this Court.

4.      The amount in controversy in this action exceeds $75,000.


PARTIES AND JURISDICTION

5.      Plaintiffs Otar Dularidze and Alona Lensky are US citizens who are domiciled in New

        York City.[1]

6.      Turkish Airlines is a foreign corporation with its principal place of business in Istanbul,

        Turkey.  TA has a place of business in the Southern District of New York at 350 Fifth

        Avenue Suite 7510, New York, NY.  TA regularly operates commercial air service into

        JFK Airport multiple times a week, and sells in this District tickets for carriage. The

---

[1] Plaintiff Dularidze was recently granted US citizenship; however, his swearing in ceremony, which was scheduled to occur in March of this year was postponed due to the coronavirus pandemic.  It is likely to be rescheduled shortly now that some New York

Plaintiffs physically purchased their tickets for travel on TA in New York City and the complained of injuries happened as a result of this transaction.  TA has not registered as a foreign corporation with the New York State Corporation Commission ("SCC") but a corporation named as "Turkish Air Lines, Inc." registered as a domestic corporation with the SCC at the address of TA in Manhattan in order to transact any business in the State of New York.  A foreign corporation may not transact business in NY until it obtains a certificate of authority from the SCC. By registering to do business in NY with the SCC and  obtaining a certificate of authority, thereby availing itself of the benefits and privileges of the laws of NY,  by regularly flying passengers and cargo to and from and selling tickets for carriage within NY, TA has purposefully availed itself of the privilege of conducting activities in NY and has subjected itself to the sovereign laws of NY. In addition, TA has substantial revenues and expenses in this District.

7.      The injuries suffered by all of the Plaintiffs arise directly out of the Defendant's conduct and the injuries have a direct connection with the Defendant because they arose directly from TA's commercial air service to NY and the tickets purchased in New York City. The actions of TA when Plaintiffs attempted to board the aircraft for their reserved and fully paid for return flight to NY relate to Defendant's conduct directed into NY: commercial air service.

8.      Additionally, personal jurisdiction is conferred by the New York jurisdictional long arm statute NY CPLR §302(a) (1, 3).

GENERAL ALLEGATION OF AGENCY

9.      Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned,

each of the complained of agents, contractors and employees of Turkish Airlines was a

servant of Defendant Turkish Airlines, and at all times herein mentioned, each was acting

within the purpose and scope of said agency and employment. The police officers

referred to in this complaint were acting at the request, instruction and control of TA.


GENERAL ALLEGATION OF COMPLIANCE

10.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned,

in the course of their dealings with the Defendant, the Plaintiffs complied in all respects,

whether or not material, with all conditions, requirements, ordinances, and legal and

contractual undertakings incumbent upon them in connection with their Contracts with

Defendant TA, and with the rules and ordinances of the authorities at the airport of

departure and proposed arrival, all aircraft placards and all crew member instructions.


FACTUAL ALLEGATIONS

11.      In early 2019, Plaintiffs booked reservations and purchased tickets on Turkish Airlines to

travel May19-July1from JFK airport to Tbilisi, Georgia with a 1 hour layover at Istanbul

Airport during both their inbound and outbound journey.

12.     Plaintiffs purchased their tickets online while at their New York residence.

4

13.    On July 1, 2019 Plaintiffs arrived at Istanbul Airport from Tblisi, Georgia, with children

aged 3.5 and 9 months, and proceeded to gate A3(A) for a 6:50AM departure for their

return to New York City.

14.    Plaintiffs arrived at the gate in a timely manner and presented passports and tickets.

15.    Plaintiffs' tickets were accepted and stamped by the gate agent and they proceeded, with

a group of other passengers, down the jetway to the airplane entrance.

16.    As they waited in line to board, a Turkish Airlines employee repeatedly entered and

exited the plane in a state of agitation, taking people from the line in front of and behind

the Plaintiffs until only the Plaintiffs remained waiting to board.

17.    At this point, Plaintiffs were told the flight was closed.

18.    Plaintiff Dularidze protested this inexplicable unfairness and requested to speak with a

supervisor.

19.    The TA employees were unresponsive to this request.

20.    Around this time, Plaintiff Dularidze began to videotape his interaction with the gate

agents.

21.    He videotaped their badges, the plane being closed and pulling away from the jet bridge,

his interactions with the agents asking why his family was being denied entrance to the

plane despite being checked in and standing in line on the jet bridge.

22.    Plaintiffs were told to leave the jet bridge and return to the terminal because the plane

was closed and locked for departure, but Plaintiffs refused to leave until someone came

and they were able to file a complaint.

23.    TA agents still refused and suddenly spoke no English.

24.    Plaintiffs sat on the floor in the jet bridge until eventually the police arrived.

25. Police told them to leave the jet bridge, but Plaintiffs insisted that police take a report against the airline first.

26. At this point one of the policemen grabbed their 9 month old infant without Plaintiffs' permission or authority and exited up the jet bridge with the infant in his arms, forcing Plaintiffs to follow.

27. Once back inside the terminal, the policeman handed their infant to a Turkish Airlines employee, who held him, without authority and permission, during the course of Plaintiffs' interaction with the police.

28. Plaintiffs asked if police would now take their report, but police ignored them and asked the TA employees what they would like to do with "these people" (the Plaintiffs).

29. The TA employees informed the police that Plaintiffs had taken a video which they wanted deleted.

30. The officers turned back to the Plaintiffs and demanded that the video be deleted.

31. Plaintiff Dularidze refused and the two police officers present became hostile, cornered him against an L-shaped counter and began to attempt to physically grab his phone from him.

32. Plaintiff Dularidze had his hands in the air in a non-threatening manner, shocked by this behavior, exclaiming that he was asking the police for help.

33. At this point the police officers grabbed Plaintiff Dularidze by the neck and dragged him towards a nearby closed door, accompanied by one of the TA gate agents, who used either a fingerprint or a key card to allow the police entrance.

34. The door opened into a private bathroom.

35. The two police officers dragged Plaintiff Dularidze inside and closed the door.

36.     The one officer holding Plaintiff Dularidze stepped on his feet, kneed him in the legs and struck him repeatedly in the torso.

37.     The other officer pulled out his gun and pressed the barrel between his eyes, threatening to kill him.

38.     The officer then struck the Plaintiff in the side of the head and in the jaw with the handle of his gun.

39.     When Plaintiff Dularidze informed him that he had just had surgery on his jaw days before, while in Georgia, the officer took his thumb and drove it into the spot indicated.

40.     At one point, the officers opened the door and pointed out to his children and told him it was the last time he was going to see them. [2]

41.     Plaintiff Dularidze, in fear for his life, pushed his way out, with his hands up, screaming for help.

42.     His wife was scared and crying loudly during this time and attempted to reach her husband.

43.     The police pushed her back and dragged Plaintiff Dularidze back into the bathroom.

44.     TA employees were standing around observing the entire incident, making no effort to intervene. The police were requested by the TA staff and the TA staff did nothing to help Plaintiff Dularidze.

45.     Plaintiff Dularidze, back in the camera-less bathroom and now in mortal fear for his life, unlocked his phone and gave it to the police, who proceeded to delete the videos of his

---

[2] A number of unsolved murders have taken place in the bathrooms at Istanbul airport, according to news reports. Plaintiffs think this is because there are no cameras in the bathrooms.

interactions with the TA employees.  Thus the police acted to assist the TA staff and arrived and became involved at their request.

46.   Plaintiff Dularidze was then released from the bathroom, the police officers spoke with the TA employees, and then they departed.

47.   Plaintiffs were assisted by an airport employee who had arrived earlier, directly preceding the police, and had provided some translation assistance.

48.   This airport employee had witnessed the entire episode and seemed shocked.  He advised them to contact the airline management.

49.   This airport employee had an extensive conversation in Turkish with an airline supervisor in which the Plaintiffs could only make out the word for police.  After which they were upgraded to business class and flew home six hours later.

50.   Plaintiff Dularidze suffered a scrape on his neck where he was grabbed by police and bruising and swelling in his mouth where he was struck.

51.   He still suffers from debilitating pain in his leg as a result of the incident, for which he visited the doctor when he returned home, was given an MRI and is still receiving treatment.

52.   Plaintiff Dularidze has suffered lasting emotional consequences and has been diagnosed with PTSD.


AS AND FOR A FIRST CAUSE OF ACTION FOR NEGLIGENCE BY ALL NAMED PLAINTIFFS

53.   Paragraphs 1-52 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

54.     Defendant had a duty to exercise reasonable care to avoid foreseeable harm to the Plaintiffs.

55.     Defendant had a heightened duty of care as a common carrier to ensure the safety and well-being of its passengers.

56.     It was reasonably foreseeable that Defendant's improper request for police assistance in the destruction of evidence of its wrongful behavior could result in the abuse that Plaintiffs received.

57.     Defendant was aware of the abuse Plaintiffs were receiving as it occurred.

58.     Defendant breached its duty to the Plaintiffs by wrongly instigating a violent interaction with the police and by failing to intervene to stop what occurred.

59.     The treatment Plaintiffs received at the hands of the police was at the behest of and for the benefit of the defendant.

60.     Defendant observed, assisted, and endorsed what occurred.

61.     Defendant's actions were a breach of its duty of care – both ordinary care and the heightened care of a common carrier.

62.      As a result, Plaintiffs suffered physical injuries, terror, and lasting emotional and physical distress.


AS AND FOR A SECOND CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, BY ALL PLAINTIFFS

63.     Paragraphs 1-62 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

64. Defendant had a duty as a common carrier to provide a high level of care for the safety of its passengers.

65. By precipitating, participating in, and benefitting from the beating administered to the Plaintiff and the death threats that inflicted such terror, Defendant breached that duty.

66. The treatment of the Plaintiff was a foreseeable result of Defendants actions – both in calling the police for help in forcing Plaintiff to destroy evidence, and in assisting the police in dragging Plaintiff into a camera-less bathroom.

67. The type of negligence involved in this claim provides an assurance of genuineness:  It is common sense to conclude that police dragging a person into a camera-less bathroom for purposes of intimidation will cause emotional distress.

68. Turkish Airline's breach of duty to Plaintiff Dularidze unreasonably endangered his physical safety

69. Turkish Airline's breach of duty to Plaintiff Dularidze caused him to fear for his physical safety.

70. As a result Plaintiff Dularidze has suffered physical and emotional damages including a swollen jaw, a gouged neck, lasting nerve pain in his leg that is receiving ongoing treatment, migraine headaches, sleeplessness, nightmares, flashbacks, and depression, all due to PTSD.

71. Plaintiff Lensky, as a bystander in the zone of danger to the savagery that was inflicted upon her husband and the intimidation and fear intended by grabbing her 9-month old infant and exiting the room with him, suffered terror, horror, and has experienced lasting emotional trauma.

AS AND FOR A THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF

EMOTIONAL DISTRESS, BY PLAINTIFF DULARIDZE

72.     Paragraphs 1-71 of this Complaint, inclusive, are hereby incorporated by reference as if

set forth in full herein.

73.     Throughout the entire course of their interactions with the Plaintiffs, Turkish Airline

employees were acting in the interest of serving their employer by conducting boarding

and denied boarding operations.  It was foreseeable that the nature of the task they were

given to perform could result in irate passengers.  It was part of these employees' job

description to appropriately handle such situations with care and responsibility for

passengers' safety, and it was foreseeable that employees could do so improperly.

74.     Defendant's employees engaged in extreme and outrageous conduct towards Plaintiff

Dularidze by summoning the police and eliciting their assistance in forcing him to delete

his personally filmed videos purporting to reveal improper actions taken by the

employees.

75.     Defendant's employees engaged in extreme and outrageous behavior by participating in

the abuse of Plaintiff Dularidze by unlocking and opening a private bathroom door so

police could beat and threaten him out of the sight of cameras and force Dularidze to

delete the film the TA employees could not accomplish.

76.     Defendants engaged in extreme and outrageous conduct towards Plaintiff Dularidze by

standing around and observing while the outrageous acts were being taken, failing to

intervene to stop them, and ultimately benefitting from and presumably thanking the

police for engaging with them.

77.   Defendant's employees intended the severe distress that Plaintiff Dularidze suffered or disregarded the substantial probability that it would occur.

78.   Defendant Dularidze experienced severe emotional distress when he feared for his life while in the bathroom – knowing that the officers' death threats were not empty – they could claim self-defense and they were in a camera-less bathroom precisely so they could get away with it.

79.   Defendant Dularidze has experienced severe emotional distress in the months following the assault as he has mentally tried to process and move past the experience.

80.   He has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and is undergoing treatment.


AS AND FOR A FOURTH CAUSE OF ACTION FOR ASSAULT

81.   Paragraphs 1-80 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

82.   By participating with the police as they dragged Plaintiff Dularidze towards the camera-less bathroom and by unlocking the door to allow the police its use, TA employees knew that harm was imminent to Plaintiff Dularidze and they intended that harm to occur so that the videos showing their behavior would be deleted

83.   TA employees literally held the key to enable the infliction of harm, and they used it, opening the door to a camera-less space for the police to brutalize the Plaintiff.

84.   When TA employees opened the bathroom door, and Plaintiff Dularidze realized that he was being dragged into a bathroom, he felt the imminent apprehension of harm that the TA employees intended.

AS AND FOR A FIFTH CAUSE OF ACTION FOR FALSE IMPRISONMENT

85. Paragraphs 1-84 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

86. TA employees asked the police to force the Plaintiff to delete the videos that he intended to use against them.

87. TA employees knew what the police intended when they dragged the Plaintiff towards the bathroom door and asked the TA employees to unlock it for them.

88. TA employees intended for the Plaintiff to be unlawfully held inside the bathroom, against his will, until he complied with their demand.

89. As a result of TA demands to the police and participation with the police, the Plaintiff was falsely imprisoned in the airport bathroom until he was coerced into complying with the TA employees' unlawful demands

AS AND FOR A SIXTH (ALTERNATE) CAUSE OF ACTION FOR AN "ACCIDENT"
PASSENGER INJURY UNDER THE MONTREAL CONVENTION

90. Paragraphs 1-89 of this Complaint, inclusive, are hereby incorporated by reference as if set forth in full herein.

91. Plaintiffs' injuries resulted from an accident pursuant to Article 17 of the Montreal Convention, insofar as his injuries were caused by an unexpected or unusual event or occurrence external to the Plaintiff, and not by his own internal reaction to the normal operation of the aircraft.

92. The accident suffered by the Plaintiffs was a direct result of the negligence of TA employees.

93.    As a result, TA is liable to the Plaintiffs for an amount exceeding the limits set forth by

the Treaty, to include the pain and suffering associated with their injuries. Defendant TA

cannot meet its burden of proving that its negligence did not cause or contribute to the

aforesaid accident and the resulting injuries to Plaintiff Duladidze.

94.    Defendant cannot meet its burden of proving that the injuries suffered by Plaintiff

Duladidze were caused solely by the acts of third parties.

PRAYER FOR RELEF

95.    Wherefore, Plaintiffs pray for relief from this Honorable Court as follows:

96.    On the first cause of action for negligence, an amount to be determined at trial, but at

least $75,000.

97.    On the second cause of action for negligent infliction of emotional distress, an amount to

be determined at trial, but at least $75,000.

98.    On the third cause of action for intentional infliction of emotional distress, an amount to

be determined at trial, but at least $75,000.

99.    On the fourth cause of action, for assault, an amount to be determined at trial, but at least

$75,000.

100.    On the fifth cause of action, for false imprisonment, an amount to be determined at trial,

but at least $75,000.

101.    On the sixth cause of action, for an accident under the Montreal Treaty, an amount to be

determined at trial.

102.    For punitive damages for all causes of action, other than the sixth cause of action

pursuant to the Montreal Convention,  in an amount to be determined at trial, but at least

$75,000.

103.    An aggregate amount of all damages, whether under the first five causes of action, or

under the sixth, an amount to be determined at trial, but not less than $5,000,000.

JURY TRIAL

104.    Pursuant to the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all

issues so triable.

Respectfully Submitted,


_____  /s/ Thatcher A. Stone  _____

Thatcher A. Stone  (Admitted in New York and before this Court )


_____  /s/ William T. Woodrow III  _____

William T. Woodrow III (Pro Hace Vice to be requested when the Virginia Bar overcomes
    delays associated with Covid-19 and transmits a good standing certificate)

Stone & Woodrow LLP
250 West Main Street, Suite 201
Charlottesville, VA 22902
Email:     thatcher@stoneandwoodrowlaw.com
           will@stoneandwoodrowlaw.com
Phone: (855) 275-7378
Fax: (646) 873-7529
*Attorneys for Plaintiffs*